UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIRECT CONSTRUCTION
SERVICES, LLC and
TIMOTHY DRAKEFORD,                          Case No. 18-cv-12356

                    Plaintiffs,

                                            Paul D. Borman
v.                                          United States District Judge

CITY OF DETROIT, MAYOR
MICHAEL EDWARD DUGGAN,
DETROIT LAND BANK AUTHORITY,
TAMMY DANIELS, in her official capacity,
IRENE TUCKER, in her official capacity,
BOYSIE JACKSON, in his official capacity,
RON CRAWFORD, in his official capacity,
TIMOTHY M. PALAZZOLO, in his official
capacity, BRIAN FARKAS, in his official
capacity, jointly and severally,

                    Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS'
## MOTIONS TO DISMISS (ECF NOS. 10, 25, 29)

In this civil rights action, filed under 42 U.S.C. §§ 1981 and 1983 and the

Michigan Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2501, *et seq.* ("the

ELCRA"), Plaintiffs allege that they have been discriminated against on the basis of

race in the performance of contracts for the demolition of blighted properties in the

City of Detroit.  Plaintiffs allege that "Defendants" have wrongfully suspended

1

contracts with the Plaintiffs and have discriminated on the basis of race in the implementation of the "Hardest Hit Homeowners Demolition Program," including failing to timely pay black contractors in comparison to their white counterparts, improper and disparate discipline of black contractors, and retaliation against black contractors on the basis of race.  (ECF No. 1 Complaint ¶ 26.)

Each of the "entity Defendants," the City of Detroit, the Detroit Building Authority ("the DBA"), and the Detroit Land Bank Authority ("the DLBA"), has filed a motion to dismiss the Plaintiffs' Complaint.  (ECF Nos. 10, 25, 29.)  The motions have been fully briefed and the Court held hearings on February 27, 2019, March 7, 2019, and March 13, 2019.  Because Plaintiffs have sued municipal entities and individual Defendants purportedly employed by those entities in their official capacities only, and  fail to properly plead that an official policy or custom was the moving force behind any claimed constitutional violation, and because Plaintiffs fail to properly plead that any similarly situated white contractors engaged in similar conduct but were treated differently, the Court GRANTS the motions to dismiss Plaintiffs' federal claims and declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

# I. FACTUAL BACKGROUND[1]

Plaintiff Direct Construction Services, LLC ("DCS") performs demolition work on properties throughout the City of Detroit and Plaintiff Timothy Drakeford is the managing member of DCS. (Compl. ¶¶ 2, 34.) Plaintiff DCS is a minority owned and operated company located in the City of Detroit and Timothy Drakeford is of African-American descent. (Compl. ¶¶ 30-32.) Plaintiffs allege that the DLBA and the DBA are quasi-municipal corporations pursuant to MCR 2.105. Plaintiffs sue the City of Detroit Mayor Mike Duggan without reference to capacity.[2] (Compl. ¶ 4.) Plaintiffs sue each of the remaining individual Defendants only and expressly in their official capacities: Tammy Daniels is sued in her official capacity, allegedly as the Executive Director of the DLBA; Irene Tucker is sued in her official capacity, allegedly as the Chief Financial Officer of the DLBA; Boysie Jackson is sued in her official capacity, allegedly as the Purchasing Director for the City of Detroit; Ron Crawford is sued in his official capacity, allegedly as the Compliance Officer for the City of Detroit; Brian

---

[1] The factual background is taken directly from the allegations of the Plaintiffs' Complaint, and/or from the Exhibits attached to the Complaint, and such facts are assumed to be true as required when the Court decides a motion to dismiss filed under Fed. R. Civ. P. 12(b)(6).

[2] Plaintiffs do not allege in their Complaint *any* conduct on the part of Mayor Duggan that could form the basis for a claim against him. In fact, other than the allegation in paragraph 4 that he is the mayor of the City of Detroit, neither his name nor his title is mentioned again in the Complaint. The claims against Mayor Duggan are DISMISSED.

Farkas is sued in his official capacity, allegedly as the Demolition Special Projects Director for the DBA; and Timothy Palazzolo is sued in his official capacity, allegedly as the Demolition Operations Manager for the City of Detroit. (Compl. ¶¶ 5-12.)

The Complaint alleges that the federal Home Affordable Modification Program ("HAMP") created a component entitled the "Hardest Hit Funds," for states with exceptionally high mortgage foreclosures, and Michigan was identified as one of those states. The Hardest Hit Funds program initially provided assistance to individual homeowners with mortgage and tax foreclosures but was expanded to permit local municipalities to designate funding for demolition of residential housing that posed a safety and/or health risk, as many homes remained vacant after foreclosure, creating blight and safety concerns in the affected communities. (Compl. ¶¶ 19-20.)

The City of Detroit was awarded funds from the Hardest Hit Fund and created a Demolition Program for the utilization of those funds, which was ultimately implemented through the DLBA, with the Michigan State Housing Authority ("MSHDA") acting as the federal fiduciary. The DBA acted as the management agent for the City of Detroit to coordinate and implement the Demolition Program. (Compl. ¶ 21, Ex. 2, Demolition Management Agreement between the City of Detroit and the DBA 1, ("the DMA") PgID 28.) The DMA was between the City of Detroit, acting through its Department of Housing and Revitalization ("DHR") and its Buildings,

Safety, Engineering and Environmental Department ("BSEED") on the one hand, and the DBA on the other. (*Id*.)[3] The DMA states that the City desires to engage the services of the DBA to coordinate and implement the Demolition Program, defined as "the City's plan for the demolition of blighted and dangerous residential and commercial improvements located in the City." (*Id*. 2, PgID 29.) The DMA defines the City's duties in part as follows:

> A. The City shall engage in a timely fashion such Contractors, as shall be necessary to complete demolition activities approved as part of the Annual Demolition Plan.
>
> B. The City shall require in its contracts with Contractors that all such Contractors comply with the City of Detroit Demolition Policies and Procedures . . . .
>
> C. All costs and expenses of the Contractors shall be paid by the BSEED and DHR as applicable when such costs and expenses become due, and the DBA shall have no obligation to pay such costs.
>
> D. The City shall enter into one or more written contracts for the demolition components of the Project.

(*Id*. 2-3, ¶ 4, PgID 29-30.) The DMA then designates certain contractual provisions that must be contained in any contract or subcontract executed by the City or its

---

[3] "[A]t the motion to dismiss stage we may review 'items appearing in . . . exhibits attached to [a] defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein.'" *Harcz v. Boucher*, __F. App'x__, 2019 WL 952337, at *6 n. 3 (6th Cir. Feb. 26, 2019) (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

contractors in connection with the Demolition Program.  (*Id*. 3-4, PgID 30-31.)  The

DMA also defines specific duties of the DHR, defined under the DMA as one of the

acting entities for the City, which include "working in conjunction with the City

Purchasing Department [to] qualify and procure the services of demolition contractors,

professionals, and other vendors" through an approved procurement process and

"monitor[ing] the progress of project implementation and expenditure of funds."  (*Id*.

5, ¶ 5, PgID 32.)  The DMA provides that the parties to the DMA agree that they shall

comply with all laws governing fair employment practices and equal employment

opportunity in connection with execution of their duties under the DMA.  (*Id*. 7, ¶ 9,

PgID 33.)

        As part of the Demolition Program, minority contractors were solicited and

encouraged to bid on demolition contract packages "to enhance their businesses and

perform viable work for the Detroit Land Bank Authority and improv[e] the quality

of life for the citizens of the City of Detroit."  (Compl. ¶¶ 22-23.)  When it came to

light that there were "issues" with the amount of money being charged for demolition

under the DLBA Demolition Program that was funded with Hardest Hit Fund dollars,

some contractors including the Plaintiffs were asked to change bidding and cost

numbers after the initial invoicing to reflect compliance under the Hardest Hit

Homeowners guidelines.  Plaintiffs refused to make changes in their numbers  post-

bidding and invoicing, as was reported in the Detroit News on November 3, 2016. (Compl. ¶¶ 24-25, Ex. 3, Detroit News Article.)

Plaintiffs, who were licensed and certified residential builders, (Compl. ¶¶ 4-10), bidded on and were awarded three (3) contracts for demolition work by the DLBA, which had "allocated a portion of its Hardest Hit Funds to demolition funds to provide for funding neighborhood improvement projects for demolition of residential properties." (Compl. ¶ 34, Ex. 11, February 18, 2016 DLBA Demolition of Residential Properties Agreement BID Group 11.12A; April 4, 2016 DLBA Demolition of Residential Properties Agreement BID Group 4.7.16B) ("the Demolition Contracts"). Under the Demolition Contracts, the Plaintiffs were "to provide demolition work necessary to demolish and remove [certain] residential properties." (Compl. Ex. 11, PgID 82.) Plaintiffs allege that receiving payment under the Demolition Contracts was much more difficult for Plaintiffs to obtain from DLBA than for "larger white companies, such as Adamo and Homrich." Plaintiffs also allege that minority contractors were forced to do work outside the scope of the Demolition Contracts, such a cleaning trash from previously-cleared properties. (Compl. ¶ 35, PgID 9.) Plaintiffs allege that this "unfair treatment" became very noticeable and "an investigation into the hefty payments to white companies began." Plaintiffs allege that after the DLBA and DBA learned they had been overpricing, they asked contractors

"to adjust their numbers to fit within the designated cost cap." (Compl. ¶ 36, PgID 9.) Plaintiffs allege that they refused to comply and refused to adjust their numbers.

Plaintiffs allege that they had been performing under the two contracts they had been awarded for a total of 48 homes when Plaintiffs received an immediate "Stop Work Order" in a letter dated December 19, 2016, from DLBA. (Compl. ¶ 37, PgID 9, Ex. 12, December 19, 2016 Stop Work Order.) Plaintiffs allege that there was no explanation given for the Stop Work Order, but the letter itself, which is attached to the Plaintiffs' Complaint, states that it is being issued due to "an ongoing investigation by the Office of the Inspector General ["OIG"] of the City of Detroit into work performed by Direct Construction Services, LLC." (Compl. Ex. 12.) Plaintiffs allege that "interestingly," Plaintiffs received a new DBA-issued "Policy on Contractor Discipline" dated December 22, 2016, just three days after receiving the Stop Work Order from DLBA. (Compl. ¶37, PgID 9, Ex. 13.) This policy "describes penalties to be imposed by the City of Detroit and the DLBA should a contractor fail to perform any required component of the abatement, demolition, reporting or invoicing process." (Compl. Ex. 13, PgID 119) (emphasis added). It also gives "the City, the DLBA, and the DBA" the authority to declare a contractor in default under any contract to do work for the City or the DBA or the DLBA. (*Id.*)

The OIG Report states that the OIG received a complaint from the DLBA on

December 1, 2016, regarding an alleged falsification of sidewalk photographs submitted to DLBA by DCS.  (Compl. ¶ 44, Ex. 21, February 1, 2017 OIG Report.)  The Report states that the DLBA's Requests for Proposals ("RFP's) detail contractor requirements regarding before and after photographs of sidewalks, drive approaches, neighboring residences and/or structures, surrounding properties to be demolished – contractors are required to protect sidewalks from damage or pay to repair or replace, and thus are required to take before and after photographs of the sidewalk areas.  (OIG Report 1-2, PgID 155-56.)  DLBA suspected that the photographs depicting the sidewalks at the five properties in question had been altered, initiating the OIG investigation.

OIG interviewed Plaintiff Drakeford on December 8, 2016, and Drakeford explained to the OIG investigator that he (Drakeford) takes before and after photographs with his phone and that DCS hires subcontractors to repair sidewalks but he was not able to put the OIG in contact with the subcontractor (Dan Manville) who allegedly was hired to repair the sidewalks at the five properties. (OIG Report 3-4, PgID 157-58.)  On January 5, 2017, Drakeford provided the OIG investigator with a photocopy of a cancelled check made out to Dan Manville for $2,200.00 and indicating in the "for" section that it was for "Refund/Sidewalk Repair." (*Id.* 4, PgID 158.)  According to the OIG Report, Drakeford was shown the photographs of the five

properties and agreed that they looked altered but stated that the subcontractor took the photographs and was responsible for forwarding the photos to Drakeford. But Drakeford explained to the OIG investigator that he broke his phone and was unable to produce the photographs he received from the subcontractor. Drakeford admitted to adding some "green spots" to certain of the photographs to conceal tires that were on the property – he stated that he did this at the direction of the DLBA who told him to "brush out the tires." (*Id*.) Drakeford stated that he did not verify that the subcontractor repaired the sidewalks on the five properties at issue, but Drakeford stated that the subcontractor had pulled the sidewalk permits and he paid the subcontractor based on evidence of the permits, which Drakeford was unable to provide to the OIG. (*Id*.) On December 16, 2016, the OIG contacted Dan Manville (who identified his last name as Villareal) who denied doing any recent work for DCS or taking or altering photographs. (*Id*. at 5, PgID 159.) Mr. Villareal explained that the $2,200.00 check to Drakeford was a refund for a demolition job that DCS was supposed to do for one of Villareal's clients – the check was dated May 3, 2016, but only one of the five properties at issue in the OIG Report was demolished before that date. (*Id*.) The OIG conducted a forensic analysis of the photographs and determined that DCS had submitted falsified photographs for payment, that Drakeford admitted to photo shopping some photographs and that he tried to shift blame to a subcontractor

who could not corroborate Drakeford's version of events and that all of the photographs of the five properties were originally taken with a Samsung phone of the type that Drakeford owned.  (*Id*. at 8, PgID 162.)  The OIG concluded that "based on Mr. Drakeford's actions, the DLBA should not allow Direct Construction to do work for the City of Detroit's demolition program."  (*Id*.)

Plaintiffs allege that they received a letter dated February 17, 2017, regarding the OIG Report, specifically delineating five (5) properties that would not be reimbursed.  (Compl. ¶ 38, Ex. 14.)  Plaintiffs allege that they fully cooperated with the OIG investigation into the five properties where photographs were allegedly altered or photo shopped and were "surprised" by the OIG Report.  (Compl. ¶ 44.)  The February 17, 2017 letter, authored by Tammy Daniels, Deputy General Counsel for the DLBA, explained that the OIG had determined that photographs of the sidewalks associated with these properties had been "photo shopped" and the DLBA was precluded from seeking reimbursement for these properties until the sidewalks and all work was "completed in a satisfactory manner." (Compl. Ex. 14, PgID 123.)  Plaintiffs began making calls regarding restarting work on the contracts but instead of receiving information and being allowed to restart work, Plaintiff Drakeford was called into a meeting and told he was indefinitely suspended.  This suspension was memorialized in a letter dated May 19, 2017, authored on DBA letterhead by Timothy

Palazzolo, "Demolition Operations Manager" at an email address of tpalazzo@detroitmi.gov. (Compl. ¶ 39, PgID 10, Ex. 15 DLBA Suspension Letter.) Plaintiff Drakeford at that point had been questioned by the FBI regarding "issues" at DLBA (the Complaint gives no indication what the subject of the FBI questioning involved) and was advised that DCS had been placed on the DLBA suspension list "indefinitely." (Compl. ¶ 40, PgID 10, Ex. 16, Contractor Suspension List.) Plaintiffs allege that DCS thereafter took bid packages to the DLBA and dropped them off and that DCS's name was immediately removed from the DLBA Suspension List. (Compl. ¶ 41, PgID 10, Ex. 17.)

Plaintiffs allege that during "this time" (May 2017) Plaintiffs were unable to get paid by the DLBA, causing several vendors to call in Plaintiffs' bond. (Compl. ¶ 42, Ex. 19.) Plaintiffs allege that the DLBA, "through Tammy Daniels, Irene Tucker, Boysie Jackson, Ron Crawford, Timothy Palazzolo, and Brian Farkas," acted in concert to allege and create a bogus picture of fraud by Plaintiff Drakeford. Plaintiffs allege that this was "outrageous" because the very conduct that Plaintiff Drakeford was accused of, i.e. photo shopping photos of sidewalks, was directed by the DLBA and the DBA, and a DLBA employee had actually emailed Drakeford and advised that if he had problems "cropping" the photos on the sites, she would assist. (Compl. ¶ 43, PgID 11, Ex. 20, PgID 150, June 29, 2016 Email from Paulette Victory, Detroit Land

Bank, to Timothy Drakeford.)

Plaintiffs continued to "do battle" with DLBA to get some type of payment for work already performed for DLBA, with no success. (Compl. ¶¶ 45-46, PgID 12, Exs. 24-27.) Plaintiffs allege that the DLBA, the DBA, and the City of Detroit "go to great lengths to collude and retaliate against contractors such as Plaintiffs." (Compl. ¶ 47.) Plaintiffs allege that they were "suspended not because of work quality but because of a refusal to change numbers in bid packages." (*Id.*) Plaintiffs allege that "moreover, Defendants Ron Crawford, Tim Palazzolo, and Tammy Daniels all acting as state actors suspended Plaintiff without due process and created a disciplinary policy and applied it retroactively." (*Id.*)

In Count I of the Complaint, alleging violations of 42 U.S.C. § 1981, Plaintiffs allege that Defendants' – no specific Defendant is mentioned in this Count – discriminatory actions on the grounds of race or color have denied Plaintiffs the rights and privileges that white citizens enjoy and that Plaintiffs have performed under its contracts but have not been paid in the same way that "its white counterparts" have been paid. (Compl. ¶¶ 50-53.) In Count II of the Complaint, alleging due process violations under 42 U.S.C. § 1983, Plaintiffs allege that Defendants Ron Crawford, Tim Palazzolo and Tammy Daniels "violated Plaintiffs due process rights by suspending Plaintiff for violating a policy that had not been created . . . and failed to

apprise Plaintiffs of any appeal process . . . ." (Compl. ¶¶ 57-58.) In Count III, captioned "Retaliation," Plaintiffs allege that "Defendants" and specifically Brian Farkas, retaliated against Plaintiffs because Plaintiffs refused to change bid numbers and cooperated with the FBI during their investigation in Detroit area. (Compl. ¶¶ 60-61.) Count IV, alleging a violation of the ELCRA, alleges that "Defendants" have discriminated against Plaintiffs on grounds of race, have refused to adhere to the terms of the Demolition Contracts, and have altered terms making Plaintiffs do excessive work outside the contract, which is not required of "white contractors." (Compl. ¶¶ 63-65.) Count V alleges Breach of Contract against DLBA and "all Defendants in their official capacity" for breach of the agreement by failing to perform. (Compl. ¶¶ 67-71.) Count VI alleges a claim for "Concert of Action." (Compl. ¶¶ 73-82.)

## II.    LEGAL STANDARD

When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). Sixth Circuit "precedent instructs that, for a complaint to survive such motions, it must contain 'either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory.'" *Buck v. City of Highland Park, Michigan*, 733

F. App'x 248, 251 (6th Cir. 2018) (quoting *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013)). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.'" *Casias v. Wal–Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay*, 695 F.3d at 539 (internal citations and quotation marks omitted). In other words, a plaintiff must provide more than "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. The Sixth Circuit has recently reiterated that "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "'The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief.'" *Sam Han v. University of Dayton*, 541 F. App'x 622, 625 (6th Cir. 2013) (quoting *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). "Unlike

the technical pleading requirements of the past, the Supreme Court established a "plausibility" standard in *Twombly* and *Iqbal* for assessing whether a complaint's factual allegations support its legal conclusions, and that standard applies to causation in discrimination claims." *Id*. at 626 (citing *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 612 (6th Cir. 2008)). "A complaint that allows the court to infer only a "mere possibility of misconduct," is insufficient to "show" that the complainant is entitled to relief and fails to meet the pleading requirements of Rule 8." *Id*. (quoting *Iqbal*, 556 U.S. at 679). "[A]lthough Plaintiff's complaint need not present "detailed factual allegations," it must allege sufficient "factual content" from which a court, informed by its "judicial experience and common sense," could draw the reasonable inference that Defendants" are liable to the plaintiff. *Id*. "This Court is not required to accept inferences drawn by Plaintiff if those inferences are unsupported by the facts alleged in the complaint." *Id*. at 627.

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims, (2) matters of which a court may take judicial notice (3) documents that are a matter of public record, and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated

without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (Internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings. . . . [C]ourts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies."); *Greenberg v. Life Ins. Co. Of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings). Where the claims rely on the existence of a written agreement, and plaintiff fails to attach the written instrument, "the defendant may introduce the pertinent exhibit," which is then considered part of the pleadings. *QQC, Inc. v. Hewlett-Packard Co*., 258 F. Supp. 2d 718, 721 (E.D. Mich. 2003). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document." *Weiner v. Klais and Co., Inc*., 108 F.3d 86, 89 (6th Cir. 1997).

## III. ANALYSIS

### A. Plaintiffs' Claims Against The Individual Defendants, Each of Whom is Named Only in His or Her Official Capacity, Are Dismissed

Plaintiffs have sued the City of Detroit, the DBA, and the DLBA, along with several officers/employees of those entities expressly in their official capacities only. The caption of the Complaint expressly designates that each of the individual Defendants is being sued "in his [or her] official capacity," and the allegations in the Complaint defining these individuals again reiterates that each is named "in his[or her] official capacity." (Compl. ¶¶ 7-12.) Nothing in the Complaint suggests individual capacity claims against any of the individual Defendants. Given these unambiguous statements of official capacity, the Plaintiffs' claims against each individual Defendant will be dismissed because a suit against an individual in his or her official (and not individual) capacity is tantamount to a suit against the governmental entity. "An individual-capacity claim is distinct from a claim against a defendant in his official capacity. The former claim may attach personal liability to the government official, whereas the latter may attach liability only to the governmental entity." *Essex v. Cty. of Livingston*, 518 F. App'x 351, 354 (6th Cir. 2013) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–67 (1985)). "In other words, an official-capacity claim is merely another name for a claim against the municipality." *Id.* (internal citations omitted)

(citing *Cady v. Arenac Cnty.*, 574 F.3d 334, 342 (6th Cir. 2009)). *See also Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015) (explaining that an action premised on an official-capacity claim "is not a suit against the official but rather is a suit against the official's office") (internal quotation marks omitted) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

Given this legal redundancy, the Court must dismiss Plaintiffs' claims against each of the individually named Defendants. Courts within the Sixth Circuit consistently affirm the dismissal of official-capacity claims against municipal officials that are duplicative of claims asserted by the plaintiff against the municipal entity itself. *See, e.g., Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 509 (6th Cir. 1996) ("We will [] affirm the dismissal of the official capacity claims against [three municipal officials] because a suit against an official of the state is treated as a suit against the municipality.") (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *Cavanaugh v. McBride*, 33 F. Supp. 3d 840, 848–49 (E.D. Mich. 2014) ("[B]ecause Cavanaugh has raised claims against Otsego County, the claims against [the county's sheriff and undersheriff] in their official capacities are duplicative and will be dismissed."), *aff'd* (6th Cir., 14-1155, Dec. 12, 2014); *Swartz Ambulance Serv., Inc. v. Genesee Cty.*, 666 F. Supp. 2d 721, 726 (E.D. Mich. 2009) ("[C]laims brought against Genesee Board of Commissioners and

19

individual Commissioners pursuant to 42 U.S.C. § 1983 are duplicative of the claim against Genesee County because official capacity suits are the equivalent of a suit against the municipality. Accordingly, the Court dismisses the Board and individual Commissioners from those claims under 42 U.S.C. § 1983.") (internal citation omitted) (citing *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994)). Accordingly, the official capacity claims against the individual Defendants, i.e. Tammy Daniels, Irene Tucker, Boysie Jackson, Ron Crawford, Timothy Palazzolo, and Brian Farkas, are dismissed. Because no individual capacity claims have been pled against these Defendants, they are dismissed from this action.

### B. Plaintiffs Fail to State a Municipal Liability Claim Against Any of the Entity Defendants Under § 1983

Having established that the individual Defendants are entitled to dismissal because the claims against them in their official capacity are redundant and duplicative of the claims against the entity Defendants, and because no individual capacity claims are pled in this action, this leaves only the claims against the City of Detroit, the DBA, and the DLBA. "[Section] 1983 provides the exclusive remedy for constitutional violations." *Foster v. Michigan*, 573 F. App'x 377, 391 (6th Cir. 2014). "[A] litigant complaining of a constitutional right must utilize 42 U.S.C. § 1983." *Id.* (internal quotation marks and citation omitted). Thus, as to each of Plaintiffs' § 1983 federal constitutional claims (Counts II and III), the Plaintiffs must allege that a policy or

custom of the entity is responsible for their injuries under *Monell v. New York Dept of Soc. Servs.*, 436 U.S. 658 (1978). "[B]efore a local government can be held liable for injuries under section 1983, whether the suit is pleaded as an official capacity suit or a suit against the local government, a plaintiff must show that his injuries were the result of some 'policy or custom' attributable to the governmental entity." *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989). Plaintiffs must demonstrate that the constitutional violation occurred *because of* the illegal policy or custom and the Sixth Circuit has established specific parameters for establishing a *Monell* claim:

> A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005). A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Here, Plaintiffs' Complaint contains *no* policy or custom allegations whatsoever, nor any proper pleading of a *Monell* claim. Plaintiffs' Complaint does

not distinguish the conduct of one entity from another, let alone allege a plausible policy claim against each one of them. There are no allegations that plausibly suggest any type of a *Monell* claim, and certainly no separate "counts" of the Complaint dedicated to a policy claim against any specific Defendant. Indeed the words "pattern, practice, custom, or policy" do not appear anywhere in the Complaint except with reference to the policy on contractor discipline (Compl. Ex. 13, Policy on Contractor Discipline). But Plaintiffs' allegations and argument regarding this policy clearly assert that it was enacted *after* Plaintiffs were ordered to stop work due to the ongoing OIG investigation. In fact, Count II of Plaintiffs' Complaint alleges that Plaintiffs were deprived of due process because Plaintiff Drakeford was improperly suspended and because Defendants "create[d] a disciplinary policy after" the suspension had been imposed. (Compl. ¶ 58.) Plaintiffs reiterate in their Response to the DLBA's motion to dismiss that "**the policy Plaintiff was suspended under was not created until after he was disciplined**." (ECF No. 33, Pls.' Resp. 3, PgID 1454.) (Emphasis in original). If the policy was created *after* discipline, it could not have *caused* the OIG investigation or the issuance of the stop work order, the conduct about which Plaintiffs complain in their Complaint. In fact, Plaintiffs clearly allege that the motivating force behind their suspension was either race discrimination and/or retaliation for Plaintiffs' cooperation with the FBI, all of which is alleged to have pre-

existed the contractor discipline policy.

Even assuming that Plaintiffs are attempting to proceed on a municipal liability claim based on the contractor discipline policy as an "illegal official policy," the allegations of the Complaint do not plausibly suggest such a claim:

> Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior*. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A plaintiff may only hold a local government entity liable under § 1983 for the entity's own wrongdoing. *Id.* A local government entity violates § 1983 where its official policy or custom actually serves to deprive an individual of his or her constitutional rights. *Id.* A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers. *Id.* Where the identified policy is itself facially lawful, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (quoting Harris, 489 U.S. at 388, 109 S.Ct. 1197 (1989)). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410, 117 S.Ct. 1382. In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be "plainly obvious." *Id.* at 412, 117 S.Ct. 1382; *see also Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997).

*Gregory v. City of Louisville*, 444 F.3d 725, 752-53 (6th Cir. 2006).

Sixth Circuit "precedent instructs that, for a complaint to survive [a motion to dismiss], it must contain 'either direct or inferential allegations respecting all material

elements necessary for recovery under a viable legal theory.'" *Buck v. City of Highland Park, Michigan*, 733 F. App'x 248, 251 (6th Cir. 2018). Plaintiffs fail to meet this threshold pleading standard as to a *Monell* claim against any of the entity Defendants based upon any "policy." Even putting aside the fact that the contractor discipline policy was enacted *after* the Plaintiff was issued a Stop Work Order and after the OIG investigation had been commenced, and therefore that policy could not be the moving force behind this alleged unconstitutional conduct, Plaintiffs' Complaint contains no allegations regarding "facial unconstitutionality" of the policy or "consistent implementation [of the policy] resulting in constitutional violations ratified by policymakers." *Gregory*, 444 F.3d at 752. None of the allegations of Plaintiffs' Complaint plausibly suggest a claim that could fit within the municipal liability framework. Thus, because the allegations of Plaintiffs' Complaint do not plausibly suggest how any policy, custom, or practice of any of the entity Defendants could support a claim of municipal liability, all of Plaintiffs' claims of constitutional violations, including Counts II and III of the Complaint, will be dismissed.[4]

---

[4] Count III of Plaintiffs' Complaint, captioned "Retaliation," contains three short and incomplete paragraphs and fails to cite any statute, constitutional provision, or other legal basis on which Plaintiffs proceed. As such, Count III fails to meet the minimal pleading standards of Fed. R. Civ. P. 8, and wholly fails to meet the *Twombly/Iqbal* plausibility standard. To the extent, however, that Count III attempts to allege any type of constitutional claim, it fails to state a plausible policy claim against any of the entity Defendants. To the extent that Count III attempts to allege state law claims, the

### C.     Plaintiffs Fail to State a Claim Under § 1981

The Sixth Circuit "has held that a plaintiff cannot use § 1981 to sue a state actor

in his or her official capacity." *McCormick v. Miami University*, 693 F.3d 654, 660

(6th Cir. 2012) (citing *Grinter v. Knight*, 532 F.3d 567, 577 (6th Cir. 2008) ("§ 1983

provides an exclusive remedy for violations against state actors sued in their official

capacities. An official capacity lawsuit against . . . a state actor[ ] for constitutional

violations, such as race discrimination, cannot be brought under § 1981."))." *See also*

*Causey v. City of Bay City*, No. 16-cv-12747, 2017 WL 4957439, at *3 (E.D. Mich.

Nov. 1, 2017) ("The Sixth Circuit holds that 'the express cause of action for damages

created by § 1983 constitutes the exclusive federal remedy for violation of the rights

guaranteed in § 1981 by state governmental units.' *Arendale v. City of Memphis*, 519

F.3d 587, 598–99 (6th Cir. 2008) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S.

701, 733 (1989)).  As the Supreme Court explained in *Jett*:

> Given our repeated recognition that the Fourteenth Amendment was
> intended in large part to embody and expand the protections of the 1866
> Act as against state actors, we believe that the logic of these decisions
> applies with equal force to petitioner's invitation to this Court to create
> a damages remedy broader than § 1983 from the declaration of rights
> now found in § 1981. We hold that the express "action at law" provided
> by § 1983 for the "deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws," provides the exclusive federal

Court declines to exercise supplemental jurisdiction over such claims, as discussed
*infra* in Section IIID.

damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor. Thus to prevail on his claim for damages against the school district, petitioner must show that the violation of his "right to make contracts" protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases.

*Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 735-36 (1989). Because § 1983 is the sole vehicle for Plaintiffs' damage claims and also for the same reasons that Plaintiffs fail to state a policy claim against the entity Defendants under § 1983, their claims under § 1981 fail as well.

Even assuming that Plaintiffs could assert a § 1981 claim in this instance, "claims of racial discrimination brought under § 1981 and § 1983 are analyzed under the same standards as Title VII and ELCRA discrimination claims." *Thompson v. City of Lansing*, 410 F. App'x 922, 934 (6th Cir. 2011) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir.1999)). Absent direct evidence of discrimination (and none is pleaded here), claims under both Title VII and the ELCRA require, *inter alia*, evidence that Plaintiffs "[were] treated differently from similarly situated individuals who are not members of [the] protected class." *Id.* Plaintiffs plead *no* facts whatsoever plausibly suggesting that the "white contractors" referred to in the Complaint and discussed in Plaintiffs' response – "Adamo" and "Homrich" – were "similarly situated" to the Plaintiffs, i.e. had been investigated by the OIG and found to have committed fraud in the performance of their demolition contract but not been

26

disciplined or suspended. Indeed the Complaint contains no reference whatsoever to a "set of operative facts" that would plausibly suggest that these "white contractors" were in any sense similarly situated to the Plaintiffs but were accorded different treatment. The mere conclusory allegations that Plaintiffs were treated differently from two white contractors fail to state an equal protection claim "that is plausible on its face." *Twombly*, 550 U.S. at 570.

### D. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiffs' State Law Claims

Given the absence of a viable federal claim, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and dismisses them without prejudice. "Once the district court dismissed all of the claims over which it had original jurisdiction, it acted squarely within its discretion by declining supplemental jurisdiction over the remaining IIED claim and dismissing it without prejudice." *Booker v. City of Beachwood*, 451 F. App'x 521, 522-23 (6th Cir. 2011) (citing 28 U.S.C. § 1367(c)(3)). "When, as here, 'all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims.'" *Id*. (quoting *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996)).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' federal claims are DISMISSED WITH PREJUDICE and Plaintiffs' state law claims are DISMISSED WITHOUT PREJUDICE. Plaintiffs' Complaint is DISMISSED in its entirety.

**IT IS SO ORDERED.**

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: April 29, 2019